**ZEMURRAY FOUNDATION,**
Plaintiff-Appellee,

v.

**UNITED STATES of America,**
Defendant-Appellant.

No. 84–3105.

United States Court of Appeals,
Fifth Circuit.

March 18, 1985.

John P. Volz, U.S. Atty., Eneid A. Francis, Asst. U.S. Atty., New Orleans, La., Michael L. Paup, Glenn L. Archer, Jr., Asst. Atty. Gen., Ann Belanger Durney, Terry L. Fredricks, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Monroe & Lemann, Thomas B. Lemann, Michael R. O'Keefe, III, New Orleans, La., for plaintiff-appellee.

Before CLARK, Chief Judge, and WISDOM and HIGGINBOTHAM, Circuit Judges.

WISDOM, Circuit Judge:

This appeal turns on the meaning and the scope of this Court's opinion in *Zemurray Foundation v. United States*, 5 Cir.1982, 687 F.2d 97 (*Zemurray I*). The plaintiff, Zemurray Foundation, is a tax-exempt private foundation. In 1974 the plaintiff sold its undivided one-half interest in a tract of timberland. The Commissioner of Internal Revenue imposed an excise tax on the sale under § 4940 of the Internal Revenue Code, which imposes a tax on the sale by a private foundation of "property *used for* the production of interest, dividends, rents, and royalties" (emphasis added). The Commissioner relied on Treas.Reg. § 53.4940–1(f)(1), which provides that property is taxable under § 4940 if it is "property of a type which *generally produces* [1] interest, [2] dividends, [3] rents, [4] royalties, or [5] *capital gains through appreciation*" (emphasis added). The plaintiff challenged the validity of this regulation in *Zemurray I* on two grounds. First, the plaintiff argued that the word "used" in the statute means "actually used", whereas the regulation reaches property that is *usable*, that is, "generally produces" income for the enumerated purposes. Second, the plaintiff maintained that the regulation improperly adds a fifth category of taxable property, "capital gains through appreciation", to the four categories enumerated in the statute.

In *Zemurray I* we rejected the plaintiff's first challenge and held that the use of the phrase "generally used" in the regulation, although it allows taxation so long as the property is usable to produce the first four categories of income, is valid. We remanded for factual findings concerning whether the timberland at issue was "susceptible for use" to produce interest, dividends, rents, or royalties. The district court, 509 F.Supp. 976, found that it was not. Now in *Zemurray II* the United States challenges that finding upon the ground that the district court erroneously placed an economic

gloss on this Court's instructions upon remand.

The scope of our holding in *Zemurray I* concerning the plaintiff's second challenge to the regulation is also at issue here. The plaintiff argues that we implicitly held the fifth category of the regulation to be invalid as an independent basis for taxation under § 4940. The government maintains that we left the issue open and argues that the fifth category provides an alternate basis for taxation of the sale of the timberland.

We hold that the district court on remand did not apply an erroneous standard for determining whether the property at issue falls into one of the first four categories of the statute and the regulation, and the court's findings under that standard are not clearly erroneous. We further hold that the fifth category of the regulation (capital gains through appreciation) does not provide an independent basis for taxation under § 4940; it is valid only to the extent that it reaches property which is of a type that generally produces interest, dividends, rents, or royalties.

## I. STATEMENT OF THE CASE

In 1961 Samuel Zemurray bequeathed the naked ownership[1] of his one-half interest in 12,746 acres of unimproved timberland in Tangipahoa Parish, Louisiana to the plaintiff and bequeathed to his wife Sarah the usufruct. On February 16, 1974, Sarah donated to the plaintiff the usufruct, giving the plaintiff full ownership to an undivided one-half interest in the timberland. During the period in which Sarah was the usufructuary, all proceeds from the sale of timber from the land went to her. On February 21, 1974 the plaintiff agreed to sell its undivided one-half interest in the land to an unrelated third party. The sale was consummated in June of that year.[2] The plain-

---

1. Under Louisiana law, a "naked ownership" is an imperfect ownership subject to a usufruct interest held by another. La.Civ.Code Ann. art. 478 (West Supp.1984).

2. The timberland greatly appreciated in value in the years preceding the sale. The parties stipulated that on December 31, 1969, the value of a one-half interest in the land was $2,716,540.

tiff, having of course only received the naked ownership, never received any income from the property.

On March 31, 1978 the Commission assessed a deficiency against the plaintiff for its 1974 tax year in the amount of $112,317. The deficiency was based upon the Commissioner's determination that the gain from the sale was subject to the excise tax imposed by § 4940 of the Internal Revenue Code,[3] 26 U.S.C. § 4940. That section taxes the "net investment income" of charitable foundations. Section 4940(c)(1) defines "net investment income" as "gross investment income" plus "capital gain net income" minus allowable deductions. Section 4940(c)(4) defines "capital gain net income" to include gains from the sale of "property used for the production of interest, dividends, rents, and royalties". The plaintiff paid the deficiency and sued in district court for a refund.

### A. The First Trial

In support of his determination, the Commissioner relied on Treas.Reg. § 53.4940–1(f)(1), which provides that capital gains resulting from the disposition of property held "for investment purposes" are subject to tax under § 4940. As previously noted, the regulation provides that property "shall be treated as held for investment purposes even though such property is disposed of by the foundation immediately upon its receipt, if it is property *of a type which generally produces* [1] interest, [2] dividends, [3] rents, [4] royalties, or [5] capital gains through appreciation (for example, rental real estate, stock, bonds, mineral interests, mortgages, and securities)" (emphasis added). The Commissioner argued that the timberland was property of a type that generally produces rents, royalties, and capital gains through appreciation. The plaintiff argued that because it did not actually receive any income in the four categories listed in the Code and received only the proceeds of the sale, the property

was not "used" within the meaning of § 4940(c)(4)(A) "for the production of interest, dividends, rents, or royalties", and its sale was therefore not a taxable event under § 4940. The plaintiff also disputed that the particular property at issue was of a type that generally produces rents or royalties.

The district court held that the word "used" in § 4940 should be interpreted in its ordinary sense to mean "actually used" and not, as the Commissioner asserted, "susceptible of use". The court ruled that because the regulation requires only that the property in question be "of a type that generally produces" interest, dividends, rents, or royalties, rather than that the property be actually used to produce the enumerated revenues, the regulation was overbroad and invalid. Because the timberland had not been actually used for the production of rents or royalties, the court held that the sale was not subject to the excise tax.

The court also held that the regulation was overbroad in its listing of the types of property that give rise to taxable gains upon sale. The court noted that the regulation adds a fifth category of property—property that produces "capital gains through appreciation"—to the four categories enumerated in § 4940(c)(4)(A) itself. Although the court found that the timberland was the type of property that generally produces capital gains through appreciation, it ruled that the regulation was invalid to the extent that it taxed property solely on that basis.

### B. The First Appeal: Zemurray I

On appeal, this Court reversed. *Zemurray Foundation v. United States,* 5 Cir. 1982, 687 F.2d 97 (*Zemurray I*). We held that the regulation's use of the phrase "generally used", although it allows taxation "so long as the property sold is *usable* to produce the applicable types of income,

The plaintiff received $5,525,000, less $554 in expenses, from the sale in June 1974.

3. At the time of the sale, the excise tax rate was four percent. The current rate is two percent. 26 U.S.C. § 4940(a) (1982).

regardless of whether the property is actually used to produce income or not", was not unreasonable or plainly inconsistent with the statute. *Id.* at 100. We therefore concluded that the district court had erred in holding the regulation invalid with respect to its interpretation of "used" in § 4940(c)(4).

Because the district court had made no findings of fact concerning whether the timberland was property of a type that generally produces interest, dividends, rents, or royalties, putting it into one of the first four categories of the statute and the regulation, we turned to the government's argument that the fifth category of the regulation provided an alternate basis for taxation. We held that the district court had erred by ruling that the regulation was invalid to the extent it subjects to the excise tax any property that generally produces "capital gains through appreciation". The scope of our holding on this matter, however, is not entirely clear and is at issue here. With respect to the fifth category we stated:

> A narrow reading of the phrase ". . . if it is property of a type which generally produces interest, dividends, rents, royalties, or capital gains through appreciation (for example, rental real estate, stock, bonds, mineral interests, mortgages, and securities)" appears to underscore the interpretation previously made by this Court of the word "used". The regulation simply recognizes that property usable for interest, dividends, rents, or royalties may sometimes be held simply for capital gains through appreciation. Growth stocks would be a prime example, [citation omitted] and the regulation lists several others. Interpreted in this manner, this phrase in the regulation is neither unreasonable nor inconsistent with 26 U.S.C. § 4940(c)(4), and, therefore, must be presumed valid.

*Id.* at 102. We thus upheld the regulation at least to the extent of this narrow interpretation. We further stated:

> The Government broadly interprets the phrase "capital gains through apprecia-tion" [in the fifth category of the regulation] to include all noncharitable assets sold by a charitable foundation. It is not necessary to rule on the validity of this broader interpretation at this time, since the district court has not made a finding on the applicability of the more limited categories set forth in the statute.

*Id.* at 103 n. 12.

We then remanded the case with the following instructions:

> On remand, the district court should make a factual determination on whether the timberland is the type of property which generally produces interest, dividends, rents, or royalties. Even if the timberland is property held for capital gains through appreciation, the district court should treat it as property used for interest, dividends, rents, or royalties if the property is susceptible for use in this manner.

*Id.* at 102–03.

Judge Gee stated in a dissent that he could not understand why the Court was remanding, because the district court had found that the timberland fell into the fifth category of the regulation, and the Court had just reversed the district court's holding that the fifth category was invalid. He reasoned that if the fifth category is valid, then the Court should simply decide whether the district court's finding that the timberland fell into that category was clearly erroneous. Although he thought that the fifth category was invalid, he noted that the majority had not demonstrated that the district court's finding that the timberland was within that category was clearly erroneous. He therefore concluded that consistency required that the Court should simply uphold the imposition of the tax. *See* 687 F.2d at 103 n. 1.

### C. The Second Trial

On remand, the district court again held for the plaintiff. The court turned first to the question whether the timberland was the type of property that generally produced interest, dividends, rents, or royalties. The government argued that the timber-

land was susceptible of producing rents or royalties in four ways through the procurement of: (1) timber leases; (2) hunting leases; (3) cattle-grazing leases; and (4) mineral leases. The court found that, "[w]hile it is perhaps true that the timberland could have been leased for any of these purposes at *some* price, the evidence clearly indicates that these possible alternative uses would not have been economically viable". *Zemurray Foundation v. United States*, No. 79–1088, slip op. at 5 (E.D.La. Dec. 9, 1983). The court ruled that it is not enough that the timberland "was theoretically susceptible of producing rents or royalties", because "Treas.Reg. § 53.4940–1(f)(1) requires that it be at least economically prudent or reasonable for a landowner to use the property in a way that will cause it to produce the types of revenue specified in the regulation". *Id.* at 5 n. 9. The court found that the most productive manner to exploit the timberland from 1969 to 1974 was not to lease the property to a timber company, but to sell the timber under cutting contracts. The court also found that there was a low demand during the early 1970s for hunting leases, cattle-grazing leases, and mineral leases upon land in the area.

Because the court found that the timberland did not fall into the first four categories of property under the regulation, it turned to the applicability of the fifth category. The court noted that the first trial had determined that the timberland was property of a type which generally produces capital gains through appreciation and thus was within the fifth category. The court shared Judge Gee's puzzlement concerning what significance should be assigned to the fifth category in view of the fact that this Court remanded the case rather than holding that the timberland was taxable under the fifth category. The court resolved the dilemma by concluding that "the Fifth Circuit clearly meant to uphold the validity of the fifth category only to the extent that that category encompasses property properly includable in one or more of the first four categories". *Id.* at 9. The court noted that this interpre-

tation "has the effect of excluding the fifth category as an independent basis for taxation". *Id.* Because the property did not fall within one of the first four categories, the court entered judgment for the plaintiff. The government appealed.

## II. THE DISTRICT COURT APPLIED A PROPER STANDARD

The government challenges on two grounds the standard the district court applied to determine whether the timberland was susceptible of use to produce interest, dividends, rents, or royalties. First, the government argues that it is irrelevant that the *particular* property in question could not in fact have been used for the production of interest, dividends, rents, or royalties, so long as the property is *of a type* that is susceptible of producing those types of incomes. The government insists that it is "axiomatic" that rents and royalties can be derived from timberland. For support, the government points to Treas.Reg. § 1.61–8, which provides that gross income "includes rentals received or accrued from the occupancy of real estate or the use of personal property.... Gross income includes royalties. Royalties may be received from ... the exploitation of natural resources, such as coal, gas, oil, copper, or *timber* " (emphasis added).

Second, the government argues that the district court violated this Court's instructions on remand by adopting a "completely different" test for determining whether the gain realized from the sale of the timberland was taxable. The government insists that the district court's requirement that it must "be at least economically prudent or reasonable for a landowner to use the property in a way that will cause it to produce [interest, dividends, rents, or royalties]" introduces an extraneous economic requirement that was not part of this Court's test on remand. The government maintains that, putting aside the district court's economic viability test, the evidence conclusively demonstrated that the timberland was of a type of property that was susceptible of being used for the production of rents and royalties, because all witnesses

testified that the land was susceptible of being leased to a timber company for growing and harvesting trees, and that the land could have been leased in 1974 for hunting.

■ The government's arguments are flawed. With respect to the first argument, if it had been true that we did not intend for the district court to focus upon whether *this particular tract of land* was susceptible of use to generate rents or royalties and if, as the government maintains, it is "axiomatic" that rents and royalties can be derived from timberland in general, we would not have remanded the case for specific findings of fact, but rather would have ruled that as a matter of law the sale of the timberland was taxable under § 4940. We note that one court has adopted a broad-brushed approach similar to that urged by the government. In *Balso Foundation v. United States*, D.Conn. 1983, 573 F.Supp. 191, 192–93, the court stated:

> The question is not whether this [tract of unimproved woodland] is the type of land which generally produces rents. The question ... is whether land is the type of property which generally produces rents. The distinction is not between different types of land, but between land and other types of property.

Although we suggested in *Zemurray I* that the "district court may ... wish to consider the possible uses of undeveloped land set forth in *Balso* ", 687 F.2d at 103 n. 11, it is clear from the fact that we remanded for specific findings that we intended the district court to rule upon whether this particular tract of land was susceptible to the referenced "possible uses of undeveloped land". By implication, we rejected the expansive approach to taxability taken by the *Balso* court.

■ For similar reasons we cannot accept the government's second argument that the district court improperly added an economic gloss to this Court's test on remand in *Zemurray I*. It is clear that our instruction that the court should determine whether the timberland was "susceptible for use" to produce interest, dividends, rents, or royalties could not have meant merely *theoretically susceptible* of such use. Once again, if that were the test there would have been no remand, for *any* land—indeed, any property, such as a personal wristwatch or a jade figurine—is theoretically susceptible of being rented to someone for some purpose. Given that mere theoretical susceptibility is not enough, we must decide whether the district court reasonably interpreted the phrase "susceptible of use". We conclude that it did.

Our use of the phrase "susceptible of use" was in contradistinction to "actually used". Our choice of the word "susceptible" was not meant to broaden the requirement of the regulation that the property be of a type that "generally produces" the enumerated revenues. Indeed, we explicitly stated that "[o]n remand, the district court should make a factual determination on whether the timberland is the type of property which *generally produces* interest, dividends, rents, or royalties". *Id.* at 102–03 (emphasis added). The district court reasonably concluded that the phrase "generally produces" imports a requirement that one expects the property to be commonly used in the designated ways by persons of ordinary prudence. As the district court put it, "By use of the term 'generally,' Treas.Reg. § 53.4940–(1)(f)(1) requires that it be at least economically prudent or reasonable for a landowner to use the property in a way that will cause it to produce the types of revenue specified in the regulation." *Zemurray Foundation v. United States*, No. 79–1088, slip op. at 5 (E.D.La. Dec. 9, 1983). We hold that the district court did not apply an improper standard for deciding whether the timberland fell into the first four categories of property in the regulation. We therefore must decide only whether the district court's findings under that standard were clearly erroneous. We now turn to that question.

### III. THE DISTRICT COURTS FINDINGS WERE NOT CLEARLY ERRONEOUS

The district court found that the timberland was not property of a type that feasi-

bly could have been leased for four uses asserted by the government: (1) for growing timber; (2) for hunting; (3) for grazing cattle; and (4) for minerals.[4] We consider each in turn.

## A. Timber Leases

■ The government offered the testimony of James Phillips, a forester of 22 years' experience with the Internal Revenue Service, and James Morrison, a forester of 19 years' experience with the Internal Revenue Service. Phillips testified that the timberland was susceptible of producing royalties from timber leases, basing his conclusion on the fact that properties similar to the timberland have been leased, or will be leased, in the same area. He noted that the best use of the timberland is for growing timber and that it is possible for the owner to realize income from this use either by managing the land himself or by renting it to others to raise timber. Morrison testified that he had searched courthouse records to find tracts of timberland in the general area that had been leased for timber growing, compared those tracts with the Zemurray property, and concluded that the Zemurray property could similarly have been leased.

The plaintiff offered the testimony of Lewis Peters, a forestry consultant and appraiser of 30 years' experience. Peters testified that during his 30 years as a forestry consultant he had never seen a timber royalty contract. Moreover, he testified that the transactions found by the government's witness that were styled as "leases" were in fact not leases but sales, because they typically featured a long term of 60 to 99 years, a large up-front cash consideration, and either no rental payments or rental payments that were far below market rental value. Peters concluded that these transactions were cast as "leases" rather than sales to avoid the Louisiana doctrine of prescription of a mineral servitude after non-use for 10 years.[5] Peters also testified that timber companies usually required a long-term lease with the landowner, and most of the long-term timber leases with which he was familiar had proved to be economic disasters for the landowners because of inflation in market rental value over the life of the lease.

Based on this testimony, the court's finding that the Zemurray timberland was not the type of property that generally produced rents or royalties from timber leases during the period in question is not clearly erroneous.[6] The government found very few such leases,[7] and the district court reasonably credited Peters' testimony that these "leases" were more properly characterized as sales. Moreover, according to Peters, such true leases as existed had become economic disasters to the lessors. We conclude that there was sufficient evidence to support the court's finding.

## B. Hunting and Grazing Leases

■ The court's finding that the timberland was not susceptible of use for produc-

---

**4.** Neither § 4940(c)(4) nor Treas.Reg. § 53.-4940–1(f)(1) specifies the time period during which the property must be of a type generally capable of generating the enumerated revenues. The Tax Court has held that the provisions of § 4940(c)(4)(A) apply to property used either *by the foundation or by the donor* for the production of interest, dividends, rents, or royalties. *Friedman Foundation, Inc. v. Commissioner,* 71 T.C. 40 (1978). Accordingly, the district court considered the relevant time period to be the period during which Sarah Zemurray had a usufruct interest in the property as well as the period during which the Zemurray Foundation held a full ownership interest in the timberland.

**5.** *See generally* McCollam, *A Primer for the Practice of Mineral Law Under the New Louisiana*

*Mineral Code,* 50 Tul.L.Rev. 729, 739–61 (1976) (discussing the mineral servitude doctrine).

**6.** The district court found that the most productive way to exploit the timberland from 1969 to 1974 was not to lease the property to a timber company, but to sell the timber through cutting contracts. *See Zemurray Foundation v. United States,* No. 79–1088, slip op. at 6 (E.D.La. Dec. 9, 1983).

**7.** Peters testified that out of approximately 1,786,000 acres of Louisiana commercial timberland east of the Mississippi River, less than three percent of this land was actually leased for timber operations in 1974.

ing rents or royalties through hunting and grazing leases is also not clearly erroneous. Although Phillips testified that he personally had hunted on the Zemurray property, he admitted that he paid nothing for the privilege. Morrison testified that in his opinion the timberland could have been leased for hunting in 1974, but his opinion was based upon his inspection of the property in 1983. Morrison noted that a large segment of the land had a deer-proof fence around it, there were four lakes on the property, and there were permanent deer and duck blinds. Morrison admitted, however, that he was not aware of any hunting leases in the early 1970s in Tangipahoa Parish, where the Zemurray property is located. Moreover, Peters testified that the land was not susceptible for hunting leases because at the time there was no demand and there was too much open land in the area that was available to the public free of charge. Peters also noted that about 5800 of the 12,000 acres of the Zemurray property was a game preserve, upon which no hunting was allowed.

With respect to grazing leases, Peters testified that it would have been difficult to lease the land for that purpose because during the relevant period there was a lot of open range country in Tangipahoa Parish and cattle basically had free range of the central and northern end of the Parish. Peters also testified that he had never seen cattle grazed in wooded lands. Based on this testimony, the court's finding that this timberland was not the type of property that generally produced rents or royalties from grazing or hunting leases is not clearly erroneous.

*C. Mineral Leases*

■ Neither of the government's witnesses testified about the issue of mineral leases. Peters was asked whether the timberland was susceptible of mineral leasing before 1974. He replied that "most land in South Louisiana for the last 20 years has had some possibility of being leased for minerals", record at III–12, but stated that he did not believe "this particular tract could have been leased for minerals at that time", *id.* at III–13. Peters noted that there was very little mineral activity in Tangipahoa Parish in the early 1970s and interest in mineral leasing did not develop until the late 1970s. There was also evidence in the record that the only income produced by the Zemurray land from 1896 through 1964 was from timber sales. Based on the uncontroverted testimony of Peters, the district court found that the timberland was not the type of property that generally produced mineral royalties during the period in question. That finding is not clearly erroneous.

We conclude that the district court's finding that the Zemurray timberland did not fall into any of the first four categories of property under the statute and the regulation is not clearly erroneous. The government asserts as an alternate basis for taxation that the fifth category of property of the regulation—that which generally produces capital gains through appreciation—provides a valid independent basis for imposition of the excise tax under § 4940. The government asserts that because the timberland falls into that fifth category, the judgment should be reversed. We now consider the validity of the fifth category as an independent basis for taxation.

## IV. THE FIFTH CATEGORY OF THE REGULATION DOES NOT PROVIDE A VALID INDEPENDENT BASIS FOR TAXATION

■ The plaintiff insists that we implicitly held in *Zemurray I* that the fifth category of the regulation does not provide a valid independent basis for taxation under § 4940. The plaintiff argues that if the fifth category were valid, we would not have remanded the case, for the parties agreed, and the district court found in the first trial, that the timberland is property of a type that generally produces capital gains through appreciation. We do not agree that our opinion in *Zemurray I* went this far. We held in *Zemurray I* that the fifth category is valid under the following narrow interpretation: Property that is or-

dinarily of a type that produces interest, dividends, rents, or royalties, and thus falls within one of the first four categories, but which is being held in the particular instance for capital gains through appreciation, is nevertheless taxable under § 4940. We then remanded for a finding whether the property at issue fell into one of the first four categories, because if it did, there would be no need to reach the broader question whether property that falls into the fifth category but not into one of the first four—such as a valuable art object—is taxable under § 4940. We specifically declined to rule on the validity of the broad interpretation urged by the government that the fifth category validly taxes "all noncharitable assets sold by a charitable foundation". 687 F.2d at 103 n. 12.

We hold that the fifth category does not provide a valid independent basis for taxation under § 4940 and that our narrow interpretation of the fifth category in *Zemurray I* is the only valid scope of that category. We agree with the reasons given by Judge Gee in his dissent in *Zemurray I* concerning why the fifth category cannot be valid as an independent category of taxable property:

> [T]he category [is not] valid ... since it adds to the list [of types of property enumerated in § 4940(c)(4)(A)] a type of property that the law plainly omits. As an example, assume the charity was given a jade figurine or an ornate silver chalice. These do not generally produce "interest, dividends, rents [or] royalties." Thus the law as enacted by Congress would not tax their sale. They do, however, appreciate—and so the regulation would cover and tax their disposition.... I think such an inclusion of new and entirely different categories of property—an inclusion that converts a limited list of types of assets to an all-inclusive one that could more simply be phrased as "all capital assets"—is not regulation but rather legislation.

687 F.2d at 103 n. 1 (Gee, J., dissenting).

The government argues that the legislative history of § 4940(c)(4)(A) demonstrates that Congress intended to tax under that section all gains resulting from the disposition of investment-type assets used by a charitable foundation for noncharitable purposes. The government therefore urges that the fifth category, which reaches property of a type that produces "capital gains through appreciation", is a valid interpretation of § 4940(c)(4).

We do not agree with this argument for several reasons. First, the statute itself states that not all types of capital gains are to be taxed. Section 4940(c)(4)(A) states that "[t]here shall be taken into account *only* gains and losses from the sale or other disposition of property used for the production of interest, dividends, rents, and royalties ...." (emphasis added). Second, when Congress wished to draw a distinction between charitable and noncharitable use assets, it did so explicitly, as is evident in other sections of Subchapter A of Chapter 42 of Title 26, pertaining to the taxation of private foundations. For example, in § 4942(e)(1)(A), Congress provided that the "minimum investment return" for any private foundation, used in computing the tax on the undistributed income of a private foundation, is based upon the fair market value of "all assets of the foundation other than those which are used (or held for use) directly in carrying out the foundation's exempt purpose".

Third, the legislative history of § 4940 demonstrates that Congress rejected a taxation scheme based on a charitable/noncharitable asset distinction. The original House version of § 4940 sought to impose a tax upon the "net investment income" of private foundations, defined to include only income from the sale or disposition of property used for the production of interest, dividends, rents, and royalties, or property used for the production of income included in computing the tax imposed by § 511 on the unrelated business income of charitable organizations. The original Senate version took a different approach and sought "to impose an annual tax as a percentage (subject to a minimum) of the noncharitable assets of the founda-

**414**

tion". S.Rep. No. 552, 91st Cong., 1st Sess. 27, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2054.

Congress adopted the House version of § 4940 in virtually unaltered form. Because Congress adopted the net-investment-income approach, rather than the charitable/noncharitable asset approach, *see* H.R.Conf.Rep. No. 782, 91st Cong., 1st Sess. 1, *reprinted in* 91 U.S.Code Cong. & Ad.News 2392, 2392, we conclude that Congress did not intend to impose a tax on the disposition of all noncharitable assets of the foundation, as the government urges. We hold that Congress intended to impose the excise tax only upon gains from the disposition of those types of property specifically enumerated in § 4940(c)(4)(A). To the extent that the fifth category of property in the regulation goes beyond the four categories of § 4940(c)(4)(A), it is invalid.

### V. CONCLUSION

We conclude that the district court on remand did not apply an erroneous standard for determining whether the Zemurray timberland falls into one of the first four categories of the statute and the regulation, and the court's findings under that standard are not clearly erroneous. We further conclude that the fifth category of the regulation does not provide an independent basis for taxation under § 4940; it is valid only to the extent that it reaches property which is of a type that generally produces interest, dividends, rents, or royalties, but which is being held in the particular instance for capital gains through appreciation. Because the Zemurray timberland does not fall into the first four categories of property, the judgment of the district court is AFFIRMED.